

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JULIA VEGA,<br><br>                              Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL,<br>INC.,<br><br>                              Defendant. | Case No.:  3:19-CV-0663 W (BGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S SUMMARY-JUDGMENT MOTION [DOC. 64]** |

Plaintiff Julia Vega filed this lawsuit against her former employer, Defendant Honeywell International, Inc. ("Honeywell"), for gender discrimination and retaliation in violation of state and federal law.  Pending before the Court is Honeywell's summary-judgment motion.  The Court decides the matter on the papers submitted and without oral argument.  <u>See</u> Civ. L.R. 7.1(d.1).  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion [Doc. 64].

//

//

//

1

## I.   FACTUAL BACKGROUND

Plaintiff Julia Vega began working for Defendant Honeywell as an engineering intern in June 2004 while a student at the University of Washington.  (*Compl.* [Doc. 1-3] ¶ 15[1].)  In February 2005, she accepted a full-time position as a Project Engineer.  (*Id.*)  After being laid off for a month in June, Vega was rehired as a Software Engineer.  (*Id.*)

In February 2010, Vega resigned from Honeywell to relocate from Washington to San Diego, California.  (*Compl.* ¶ 16.)  Approximately two months later, Honeywell rehired Vega to work at its Poway facility, where she remained until she was allegedly constructively discharged on October 6, 2017.  (*Id.* ¶ 16.)

When Vega left Honeywell in October 2017, she was a Principal Applications Engineer in the Helicopter Usage and Monitoring System ("HUMS") group.  (*Opp'n* [Doc. 89[2]] 3:4–5; *Compl.* ¶ 18.)  HUMS encompassed approximately 60 employees at Honeywell's facilities in California, Arizona and New Mexico.  (*Compl.* ¶ 18.)  Vega was responsible for configuring Honeywell's systems for use in several different models of helicopters and for resolving technical issues.  (*Id.* ¶ 17.)   She also filled-in as a Technical Manager when her direct supervisor was out of the office for work or vacation. (*Pl's Ex. 4* [Doc. 89-5[3]] 226:11–18.)

Throughout her time at Honeywell, Vega's superiors regarded her as a diligent, competent and forthright employee. (*Pl's Ex. 7* [Doc. 89-8[4]] 80:25–81:4; *Pl's Ex. 6* [Doc. 89-7[5]] 155:21–156:2; *Pl's Ex. 13* [Doc. 89-14[6]] 89:18–91:9.)  In fact, her July 2017 midyear review characterized Vega was an outstanding employee.  (*Pl's Ex. 14* [Doc. 89-15[7]] HWI00083.)  However, Vega contends that in approximately December 2014, she

---

[1] The Complaint is attached to the Notice of Removal [Doc. 1] as Exhibit A [Doc. 1-3].
[2] The unredacted Opposition is at Doc. 69.
[3] The unredacted Exhibit 4 is at Doc. 69-3.
[4] The unredacted Exhibit 7 is at Doc. 69-6.
[5] The unredacted Exhibit 6 is at Doc. 69-5.
[6] The unredacted Exhibit 13 is at Doc. 69-11.
[7] The unredacted Exhibit 14 is at Doc. 69-12.

was discriminated against because of her gender in connection with a job offer to become a Technical Manager. Then, beginning in approximately early 2017, Vega experienced a series of discriminatory incidents that ultimately led to her decision to leave Honeywell.

**A. In December 2014, Vega is offered a Technical Manager position without a pay raise.**

In 2014, Vega's immediate supervisor was Technical Manager Dennis Martin. (*Pl's Ex. 13* at 35:11–22.) Her second level supervisor was Senior Technical Manager Mark Asplund, who was located at Honeywell's Albuquerque facility. (*Def's Ex. 1 / A* [Doc. 91-1[8]] 66:8–10; *Pl's Ex.* 4 at 63:13–23, 64:17–20; *Pl's Ex. 6* at 125:21–23.)

In May 2014, Vega was promoted to a Principal Applications Engineer and given a raise, which resulted in her making more than her direct supervisor Martin. (*Pl's Ex. 4* at 79:6–23; *Def's Ex. 3 / E* [Doc. 91-3[9]] 191:10–192:12.) Then in December, Martin retired and Asplund offered Vega the Technical Manager position, but it did not include a pay raise. (*Pl's Ex. 4* at 63:13–23, 64:17–20; *Pl's Ex. 13* at 35:11–36:3; *Def's Ex. 2 / D* [Doc. 91-2] HWI000438.)

Before retiring, Martin talked to Vega about the type of salary increase she could expect if she became a Technical Manager. (*Pl's Ex. 13* at 208:3–16.) Therefore, Vega attempted to negotiate a raise, but Asplund denied her request. (*Pl's Ex. 4* at 103:18–23, 107:14–19.) Asplund testified the salary was set by Human Resources, who indicated Vega was not eligible for a raise under the circumstances. (*Def's Ex. 5 / G* [Doc. 91-5[10]] 91:2–20; 93:18–94:23.) Additionally, although a Technical Manager took on supervisory responsibilities, Vega's move from her current position to a Technical Manager was technically a lateral move. (*Pl's Ex. 7* at 41:2–5; *Def's Ex. 7 / J* [Doc. 91-7[11]] 40:7–12.)

---

[8] The unredacted Exhibit 1/A is at Doc. 92-1.
[9] The unredacted Exhibit 3/E is at Doc. 92-2.
[10] The unredacted Exhibit 5/G is at Doc. 92-4.
[11] The unredacted Exhibit 7/J is at Doc. 92-6.

Vega nevertheless contends that when she asked Asplund about a raise, he responded "you've been doing the job already, so why should I pay you more." (*Pl's Ex. 4* at 107:5–9.) Vega ultimately turned down the job offer, and Asplund eliminated the position and made existing Technical Manager Melinda Hunt Vega's direct supervisor. (*Id.* at 103:4–17; *Pl's Ex. 7* at 49:18–22.)

### B. In 2017, Vega objects to Apslund's demand she make up for sick time.

Vega contends that at some point in approximately2017, Asplund demanded that she make up sick time by working weekends. (*Pl's Ex. 21* [Doc. 89-22] JV00014031.) Vega objected because Asplund's demand was contrary to Honeywell's policy. (*Id.*) Because Vega was correct, she was not required to make up the sick time.

### C. On June 2, 2017, Vega refuses Asplund's last minute demand that she work over the weekend.

On Friday, June 2, 2017, Vega's Technical Manager, Melinda Hunt, was on vacation. (*Pl's Ex. 36* [Doc. 89-37] HWI000387; *Pl's Ex. 4* at 234:9–14.) Vega did not find out that Hunt was gone until Friday when Asplund and others on his team reached out to her to fill in for Hunt at a meeting. (*Pl's Ex. 4* at 234:9–14.)

During the meeting, Vega was asked to complete a task that was assigned to Hunt. (*Pl's Ex. 4* at 234:9–16.) After Vega finished the task, Asplund told Vega that she was "going to have to work the weekend to bring [Hunt] up to speed on everything that [Vega had] done." (*Id.* 234:18–20.) Because Vega had family-care obligations, she declined but also explained how "we were going to meet the objective without me having to work the weekend." (*Id.* 234:20–24) Nevertheless, at the end of the meeting Asplund and Principal Engineer Staci Nielson told Vega that she was "going to work the weekend." (*Id.* 234:25–235.) Vega felt she was being pressured or bullied, and was "embarrassed because it was in a meeting setting with other people." (*Id.* 235:2–6)

4

**D.      In June 2017, Vega is replaced on an important career development opportunity in Spain.**

On June 6, 2017, Vega volunteered and was chosen to perform a HUMS aircraft survey for a potential Honeywell customer in Spain.  (*Pl's Ex. 17* [Doc. 89-18[12]] JV00014064; *Pl's Ex. 18* [Doc. 89-19] JV00014164.)  Vega believed the trip was an important professional development opportunity.

Approximately a week after Vega was chosen, Staff Engineer Dave Lilly told Hunt that a pilot was needed to "attend the meeting with the customer."  (*Pl's Ex. 7* at 120:4–9.)  As a result, Hunt replaced Vega with Principal Systems Engineer Mark DiCiero, who was a pilot.  (*Pl's Ex. 18* at JV00014164.)  Although Hunt initially believed Vega was qualified to go (*Pl's Ex. 7* at 132:6–15), Hunt's decision to replace her was based on Lilly's representation that the customer required a pilot.  (*Id.* 120:3–16, 128:18–129:16; *Pl's Ex. 19* [Doc. 89-20[13]] HWI000324.)

In fact, there was no pilot requirement.  (*Pl's Ex. 8* [Doc. 89-9[14]] HWI000314.)  DiCiero and Lilly made it up.  (*Id.*)  According to DiCiero, he believed "a man needed to go based on the [Spanish] culture and the fact that there were pilots and mechanics attending the meetings."  (*Id.* at HWI000315.)  He felt Vega did not "have the skill set to support the meeting and that it's a macho atmosphere and that they may not take well to her saying something is either good or bad."  (*Id.*)  He also "stated that within the pilot and mechanic world, gender is an issue and that we have it here and in Spain."  (*Id.*)

**E.      On June 23, Vega complains about gender discrimination.**

On June 23, 2017, after learning that there was no pilot requirement, Vega contacted Vice President Barbara Brockett to report gender discrimination regarding the

---

[12] The unredacted Exhibit 17 is at Doc. 69-15.

[13] The unredacted Exhibit 19 is at Doc. 69-17.

[14] The unredacted Exhibit 8 is at Doc. 69-7.

Spain trip. (*Pl's Ex. 11* [Doc. 89-12[15]] JV00014045; *Pl's Ex. 2* [Doc. 89-3] 77:2–79:22.) Later that day, Vega notified Hunt about her conversation with Brockett, and Hunt told Vega that another reason she did not send Vega was because of "push back from her manager [Asplund] who sighted 'perceived lack of commitment to Honeywell' as reason to deny me this customer trip." (*Pl's Ex. 21* at JV00014031.)

After talking to Hunt, Vega emailed Brockett about the conversation. (*Pl's Ex. 21* at JV00014031.) Vega relayed what Hunt said about Asplund's "push back" regarding the Spain trip, and indicated that she had been warned not to "cross him—as strong, assertive women do not fare well, there is a long memory and tendency to keep opportunities as retribution for speaking up." (*Id.*) She then identified "three points of friction over the course of a few years" with Asplund that she believed were perceived as challenges to his authority: (1) her negotiation for a raise with the Technical Manager offer; (2) resisting Asplund's demands to make up sick time; and (3) setting boundaries about working in the office on weekends because of childcare responsibilities. (*Id.*)

## F.   Five days after Vega complained about gender discrimination, she is accused of timecard fraud.

In June, Vega was involved in a "deep dive review … on [the] status and issues" on the Next Generation Health and Usage Monitoring Service ("NG HUMS"). (*Pl's Ex. 35* [Doc. 89-36[16]] at HWI000368.) Staci Nielson was the Principal Engineer on the project. (*Def's Ex. 1 / A* at 218:19–21.)

On or about June 27, 2017, Nielson requested a status report of time spent on the program. (*Pl's Ex. 10* [Doc. 89-11[17]] HWI000484.) The next day, Vega sent an email stating that she spent her time "reviewing ABM/scheduling/providing feedback." (*Id.*)

[15] The unredacted Exhibit 11 is at Doc. 69-10.
[16] The unredacted Exhibit 35 is at Doc. 69-31.
[17] The unredacted Exhibit 10 is at Doc. 69-6.

Nielson immediately responded: "You have charge[d] 61 hours the first four weeks in June for NGHUMS.  Are you saying you have spent this time reviewing ABM/schedule/providing feedback? [¶] If so, please put that in the status report." (*Id.* at HWI000485.)

Unhappy with the amount of time Vega billed for the described tasks, Nielson then emailed Hunt: "Not good. [¶] 61 hours in June for Julia = Reviewing ABM/schedule/providing feedback." (*Pl's Ex. 10* at HWI000485.)  Approximately thirty minutes later, Nielson sent another email to Asplund and Ed Prado (the Director of Engineering), with a copy to Hunt and Matthew Waterman (a project engineer), accusing Vega of "Possible Timecard Fraud."  (*Id.* at HWI000484–485; *Def's Ex. 5 / G* at 182:24–25.)  Nielson stated:

> I spoke with Melinda [Hunt] regarding my concerns around Julia Vega's June Charging against NGHUMS.  She has 61 hours in Actuals and her email states the work performed has been to 1) review the ABM, 2) Review the Schedule, 3) Provide Feedback.  Julia's participation in meetings and request for review were during Melinda's vacation.  I would have estimated that involvement to be 6 – 12 hours.

(*Pl's Ex. 10* at HWI000484.)  The same day, Prado responded and instructed Asplund and Hunt to investigate.  (*Id.*)  Hunt then contacted Vega, who agreed to confirm her hours.  (*Id.* at HWI000483.)

On June 30, Vega notified Brockett about the timecard fraud accusation and stated that the timing of it was suspicious given that it occurred "a few days after I apprised my manager of you/Kevin intending to look into the bias actions of my colleagues and learning there was resistance" from Asplund about sending her to Spain.  (*Pl's Ex. 22* [Doc. 89-23] JV00014351.)  Vega believed "there is an attempt to discredit me ahead of the VP inquiry."  (*Id.*)  Because of the timecard fraud investigation, Vega asked to be taken off the NG HUMS project.  (*Def's Ex. 1 / A* at 218:15–17.)

At some point, Waterman and Asplund talked to Hunt about the allegation and said they "didn't think that Julia would do timecard fraud but that they would go through the

steps to prove that, felt that something perhaps was going on between Julia and Staci rather than timecard fraud." (*Pl's Ex. 35* at HWI000368.)  Vega later provided more detail with specific tasks accomplished on the project.  (*Pl's 10* at HWI000490; *Def's Ex. 5 / G* at 182:11–184:24, 197:22–198:11, 198:20–201:25.)  Based on her explanation, Hunt found Vega's charges were reasonable and concluded there was no timecard fraud. (*Id.*)  Asplund agreed with Hunt's conclusion and believed Nielson should have "gone and spoken with Julia to resolve the possible miscommunication before escalating" to the timecard fraud accusation.  (*Id.*)  Asplund also directed Hunt to "close the loop with Julia and coordinate a get together with Staci and Julia" to "clear the air."  (*Pl's Ex. 35* at HWI000368.)

### G.  Vega suffers anxiety and depression, and decides to leave Honeywell.

After June 2017, Vega began experiencing severe anxiety and depression as a result of intense work stress. (*Compl.* ¶ 77.)  At the time Vega was about 4 months pregnant with her second child.

On July 17, Vega's OB/GYN observed that she was "under tremendous stress associated with workplace discrimination."  (*Compl.* ¶ 78.)  Vega was then referred to Lisa Vitale, MFT for her work-related stress.  (*Id.*)

Despite receiving treatment, Vega's mental health did not improve.  On or about August 24, 2017—after being cleared of timecard fraud—Vega was reassigned to work on the project.  (*Pl's Ex. 4* at 256:19–22, 388:17–389:3.)  Vega had a panic attack and the next day she was placed on medical leave.  (*Pl's Ex. 26* [Doc. 89-27[18]] JV00000558; *Compl.* ¶ 79.) While Vega was on medical leave, Ed Prado restructured their "team" and reassigned Asplund as Vega's direct supervisor, which Vega believed made matters worse for her.  (*Def's Ex. 5 / G* at 235:4–25; *Compl.* ¶ 70.)

---

[18] The unsealed Exhibit 26 is at Doc. 69-23.

Vega's husband was also concerned about his wife's mental health and well-being. (*Pl's Ex. 27* [Doc. 89-28] 141:24–142:11.)  Hoping she would benefit from visiting close friends, Vega's husband booked a last-minute trip to Europe to try to help her "press the reset button and move on." (*Id*. 115:24–117:5.)  While she appreciated spending time with friends, the trip ultimately did not improve her health and she continued to suffer from anxiety attacks and dissociative episodes during and following the trip. (*Pl's Ex. 24* [Doc. 89-25] 435:14–436:5.)

Meanwhile, on August 31, 2017, Vega emailed Lisa Vitale and indicated that she planned to leave Honeywell on October 9:

> Today I have met with my lawyer an [sic] they will be negotiating my exit strategy with currently [sic] employer.  There is also very good news—I have been offered employment with the other company I have interviewed at.  The new job is intended to begin Oct 9th if all goes well.

(*Def's Ex. B* [Doc. 67-2] 2228.)  On or about September 8, 2017, Vega accepted the job offer from ViaSat. (*Def's Ex. 1 / A* at 257:24–259:7.)

On Friday, October 6, 2017, Vega resigned from Honeywell.  (*Def's Ex. 1 / A* at 266:6–11.)  On Monday, she began working at ViaSat for $20,000 more than she made at Honeywell.  (*Id*. 273:5–9; *Opp'n* 1:13–14; *Pl's 4* at 263:2–17.)  Despite leaving Honeywell and beginning a new position at ViaSat, her mental health continued to suffer and she continued to receive treatment.  (*Pl's Ex. 24* at 454:4–14.)

## H.   Vega Files this Lawsuit.

On January 7, 2019, Vega filed this lawsuit against Honeywell in the San Diego Superior Court.  The Complaint asserts nine causes of action: (1) Gender and Maternity ("Sex Plus") Discrimination in violation of the California Fair Employment & Housing Act ("FEHA"), Cal. Gov. Code § 12940, *et seq.*; (2) Denial of Equal Pay in violation of the California Equal Pay Act, Cal. Labor Code § 1197.5, *et seq.*; (3) Retaliation in violation of FEHA; (4) Intentional Infliction of Emotional Distress; (5) Gender and

9

Maternity Discrimination in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; (6) Retaliation in violation of Title VII; (7) Denial of Equal Pay Act in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C §§ 206(d), 216(b); (8) Retaliation in violation of the FLSA; and (9) Constructive Discharge in violation of Public Policy.  (*See Compl.*)

On April 8, 2019, Honeywell removed the case to this Court.  Honeywell now moves for summary judgment.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."

10

<u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing <u>Richards v. Combined Ins. Co.</u>, 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing <u>Anderson</u>, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." <u>Anderson</u>, 477 U.S. at 255.

## III.   DISCUSSION

### A.   **Gender Discrimination Law**

Vega is asserting gender discrimination under Title VII and FEHA. Because California courts have relied on federal courts' interpretation of Title VII to interpret analogous state laws prohibiting discrimination, the same analysis applies to Vega's Title VII and FEHA gender discrimination claims. <u>See</u> <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270 (9th Cir. 1996); <u>Guz v. Bechtel National, Inc.</u>, 24 Ca1.4th 317, 354 ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.")

Employment discrimination claims are analyzed under the three-step burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima-facie case of discrimination; defendant must then offer a legitimate, non-discriminatory basis for the action taken; if defendant succeeds, the plaintiff must prove that defendant's proffered reason is a pretext for the action.  <u>Id.</u> at 802.

A prima-facie case of discrimination requires a plaintiff to "offer evidence that 'gives rise to an inference of unlawful discrimination.'"  <u>Palmer v. Pioneer Inn Associates</u>, Ltd, 338 F.3d 981, 984 (9th Cir. 2003) (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885,  889 (9th Cir. 1994).

## B.   <u>Gender and Maternity Discrimination (1st and 5th Causes of Action)</u>

Vega alleges gender and maternity ("sex-plus") discrimination in violation of FEHA (1st cause of action) and Title VII (5th cause of action).  In support of these causes of action, Vega asserts four separate claims: (1) disparate treatment; (2) hostile-work environment; (3) disparate impact; and (4) caregiver discrimination.  Honeywell raises a number of different arguments as to each claim.  The Court will evaluate each claim separately.

### 1.   **Disparate treatment.**

Honeywell contends Vega's disparate-treatment theory is based on two incidents: (1) Honeywell's refusal to include a pay increase with the 2014 Technical Manager offer, and (2) removing Vega from the Spain aircraft survey.  Honeywell contends summary judgment is appropriate because claims arising out of the 2014 offer are time barred and there is no evidence suggesting discrimination regarding the Spain trip.  (*P&A* [Doc. 91-

12

11[19]] 5:8–6:3.)  Vega disputes Honeywell's arguments and also appears to assert another theory supporting the disparate treatment claim: pay discrimination based on Honeywell's impossible aircraft survey target and Asplund's gender bias.  (*Opp'n* at 10:28–16:4.)

### a. Claims related to the 2014 job offer are time barred.

Honeywell contends Vega cannot sue for the alleged failure to promote her in 2014 because she failed to timely exhaust this claim.  (*P&A* at 5:9–6:3.)  Vega responds that the claim is not time barred under the continuing-violation doctrine because Honeywell continued to discriminate against her when it failed promote her in 2015, 2016, and 2017.  (*Opp'n* at 15:27–16:4.)  According to Vega's opposition, "[i]f Ms. Vega was qualified to become a Technical Manager in 2014, she was even more qualified to become one in 2015, 2016 and 2017."  (*Id.*)

Before filing a lawsuit, a plaintiff must exhaust administrative remedies by filing an administrative charge.  Martin v. Lockheed Missiles & Space Co., 29 Cal.App.4th 1718, 1724 (1994) (FEHA); Lelaind v. City of San Francisco, 576 F.Supp.2d 1079, 1092 (N.D. Cal. 2008) (Title VII).  However, under the continuing-violation doctrine, a plaintiff may sue for conduct that occurred outside the exhaustion window and would otherwise be time barred.  Lelaind, 576 F.Supp.2d at 1092 ("The 'continuing violations doctrine' allows a court, in some instances, to consider alleged unlawful behavior that would otherwise be time-barred").

In National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court evaluated the continuing-violation doctrine in the context of a discrimination claim based on discrete acts and a hostile work environment.  Id.  at 110.  With respect to discrete acts, the Court held:

---

[19] The unredacted Memorandum of Points & Authorities is at Doc. 92-8.

discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge must, therefore, be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113. The Court also identified what constitutes a "discrete act": those involving "termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. at 114.

Under Morgan, Honeywell's refusal to offer Vega a raise in connection with the 2014 Technical Manager offer constitutes a discrete act of alleged discrimination. Because Vega failed to file a timely administrative claim related to the offer, her disparate treatment claim based on the incident is time barred.

Notwithstanding Morgan, Vega's argument regarding the continuing violation doctrine is not persuasive for another reason. The evidence establishes that the Technical Manager position that was offered to Vega in 2014 was eliminated. (*Pl's 4* at 64:17–20; *Pl's Ex. 6* at 125:21–127:2.) Additionally, Vega has not provided any evidence indicating there was another opening for a Technical Manager position in 2015, 2016 or 2017. In other words, even if the 2014 promotion could be saved under the continuing-violation doctrine by subsequent failures to promote, because Vega has provided no evidence of available Technical Manager positions in 2015, 2016 or 2017, she has failed to establish a prima-facie case of discrimination related to this theory.

//

//

//

14

### b.     Spain business trip.

Honeywell contends Vega cannot establish disparate treatment in connection with the Spain trip because there is no evidence Vega's supervisor, Melinda Hunt, intended to discriminate against Vega by choosing a man for the trip. (*P&A* at 8:6–16.)  Vega responds that "revoking permission for Ms. Vega to go on the Spain trip with a clearly pretextual 'pilot requirement' was gender discrimination."  (*Opp'n* at 14:21–26.)  Vega also points to statements by Mark DiCiero as proof that she was removed from the trip because of his belief that "Vega would make Honeywell 'look weak' because Spain is a 'super macho country.'"  (*Id.* 14:22–25.)

In its reply, Honeywell argues that Vega has not proven that "the decision maker had discriminatory intent" because there is no evidence showing Hunt's decision was based on gender.  (*Reply* [Doc. 91-12] 3:21–25.)  Honeywell also contends that DiCiero's comments are "entitled to no weight."  (*Id.* 3:24–28.)

The evidence contradicts Honeywell's contention that Hunt was the sole "decision maker" regarding the Spain trip.  After initially deciding to send Vega to Spain, Hunt sent Vega an email stating "today I heard they need a pilot to attend the meeting with the customer.  If that is the case we will be sending Mark DiCiero…."  (*Pl's Ex. 18* at JV00014164.)  During her deposition, Hunt testified that she learned about the alleged pilot requirement from Dave Lilly (*Pl's Ex. 7* at 120:3–9, 127:1–3; *Pl's Ex. 19* at HW1000324), and that he recommended sending Mark DiCiero in place of Vega (*Pl's Ex. 7* at 129:8–16; *Pl's Ex. 19* at HW1000324).  Hunt also testified that she did not simply seek Dave Lilly's input into who should go on the trip, but that Hunt and Lilly "were collaborating" on the decision because Lilly was the subject-matter expert.  (*Pl's Ex. 7* at 120:10–121:3).  Moreover, during an internal investigation, DiCiero admitted that he and Lilly decided what was needed for the trip, and that "Dave notified Melinda [Hunt] that Mark would be attending."  (*Pl's Ex. 8* at HWI000314.)  Contrary to Honeywell's argument, this evidence indicates Hunt was not the only decision maker regarding the Spain trip; Lilly and DiCiero were also involved.

15

Evidence also supports Vega's contention that Lilly and DiCiero made-up the pilot requirement, and that the decision to exclude her from the trip was gender based.  During Honeywell's internal investigation, DiCiero admitted there was no "pilot requirement but rather a requirement for a guy who had lived the life and could respond to their real world question and address concerns."  (*Pl's Ex. 8* at HWI000314.)  DiCiero also told Vega the reason she did not "have the skill set to support the meeting" is because "it's a macho atmosphere and that they may not take well to her saying something is either good or bad."  (*Id.* at HWI000315.)  He also stated that "his personal opinion is that a man needed to go based on the culture and the fact that there were pilots and mechanics attending the meetings."  (*Id.*)  According to interview notes:

> Mark stated that Spain is one of the last super macho countries around and [Honeywell] needed to be prepared.  During the investigation interview, Mark said it pisses him off that this is an issue when you are speaking the truth about the culture of the country.  Mark then stated that within the pilot and mechanic world, gender is an issue and that we have it here and in Spain.

(*Id.*)  Consistent with these statements, a Honeywell incident report acknowledged that DiCiero discussed with Vega his personal view regarding the ability of a woman to be received in a business context based on Spanish culture.  (*Pl's Ex. S / 20* [Doc. 89-21[20]] HW1000297.)

Finally, contrary to DiCiero's opinion regarding Vega's qualifications for the Spain trip, Hunt testified that absent the made-up pilot requirement, she believed Vega was qualified to attend the meeting in Spain.  (*Pl's Ex. 7* at 132:6–15.)

At the very least, there is a disputed issue of fact regarding whether Vega was qualified to go on the trip and, therefore, whether Honeywell's reason for removing her was pretext.  Additionally, based on DiCiero's comments, there is sufficient evidence for

---

[20] The unsealed Exhibit 20 is at Doc. 69-18.

a reasonable jury to conclude that Vega's gender was a substantial factor in her removal from the trip.

As for Honeywell's assertion that DiCiero's statements are entitled to no weight, the argument lacks merit.  In support of this argument, Honeywell cites <u>Slatkin v. University of Redlands</u>, 88 Cal.App.4th 1147, 1160 (2001).  In that case, the plaintiff cited as evidence of discrimination an anti-Semitic remark by someone who had no relationship or involvement in a decision denying plaintiff tenure at the university.  The court rejected the evidence stating, "a person not involved in the adverse employment decision 'is entitled to virtually no weight in considering whether the firing was pretextual or whether the decisionmaker harbored discriminatory animus.'"  <u>Id.</u> at 1160 (citation omitted).

<u>Slatkin</u> is easily distinguishable because the evidence here establishes DiCiero and Lilly were heavily involved in the decision not to send Vega to Spain.  Thus, their statements are material to the decision to remove Vega from the trip.

### c.    *Pay discrimination*

Vega contends she suffered pay discrimination because of Honeywell's impossible aircraft survey target.  (*Opp'n* at 11:4–12:6.)  According to Vega, "aircraft surveys [were] in Ms. Vega's list of goals for 2016 and 2017" and they were "a 'needs development' task for Ms. Vega, and Melinda Hunt had conversations about how to give Ms. Vega survey experience with 'pretty much the entire team in Poway.'"  (*Id.* 11:12–17, citing *Pl's Exs. 7, 13*.)  Because she was "never selected to perform an aircraft survey," Vega contends it negatively impacted her compensation.  (*Id.* citing *Pl's Ex. 7*.)  Honeywell responds that Vega improperly raised this theory for the first time in her opposition and, regardless, she provides no evidence of "other" aircraft surveys.  (*Reply* at 4:8–22.)

Honeywell's contention that Vega raised this theory for the first time in her opposition lacks merit.  The issue was raised in Vega's Complaint:

17

31.     Throughout her seven-year tenure at the Poway office, Ms. Vega was selected to conduct an aircraft survey just once.  The one time she was selected was in or around December 2011, Plaintiff quickly realized that she was included only to fill the non-technical role of Russian translator for a Russian-speaking client.  The other engineer—a man—administered the survey while she translated.

32.     Because Honeywell continuously denied Plaintiff the opportunity to conduct aircraft surveys, she was unable to meet her performance requirements, preventing her from receiving merit increases to her pay for which she would otherwise have been eligible.

(*Compl.* ¶¶ 31, 32.)  Additionally, Honeywell's moving papers argued: "Plaintiff alleges she was denied the opportunity to conduct aircraft surveys on multiple occasions during her tenure.  However, reference to these other incidents are highly speculative, conclusory and not supported by the record." (*P&A* 7:21, n. 7.)  Honeywell's argument belies its contention that Vega first raised the issue in her opposition.

Moreover, as discussed above, Vega has provided evidence that she was denied the opportunity to conduct the aircraft survey in Spain because of her gender, and Hunt specifically testified that Vega was never selected to perform an aircraft survey.  From Hunt's testimony, it is reasonable to infer there were other opportunities available. Because there is evidence supporting Vega's theory, the Court finds disputed issues of fact preclude summary adjudication of this claim.[21]

### 2.     Hostile work environment.

Hostile work environment claims are cognizable under FEHA and Title VII.  See Leland, 576 F.Supp.2d at 1101 (FEHA); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) (Title VII).  To establish a hostile environment claim, Vega must show:

---

[21] Vega also contends her pay discrimination claim is supported by Asplund's gender bias.  (*Opp'n* at 11:2–3, 12:1–13:15.)  Honeywell disputes this argument.  The Court need not decide the issue because it has determined that based on the evidence, summary judgment is not appropriate.

18

(1) she was subjected to verbal or physical conduct because of her sex; (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of Vega's employment and create an abusive working environment.  Surrell v. California Water Serv., 518 F.3d 1097, 1108 (9th Cir. 2008).  "California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA."  Lyle v. Warner Brothers Television Productions, 38 Cal.4th 264, 279 (2006) (citation omitted).

In evaluating whether conduct is sufficiently severe or pervasive, courts "look at 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Nichols v. Azteca Rest. Enter., Inc., 256 F.3d 864, 872 (9th Cir. 2001) (citation omitted). Additionally, the working environment must be both objectively hostile, as perceived by a reasonable person, and subjectively hostile, as perceived by the plaintiff.  Leleand, 576 F.Supp.2d at 1101.

Honeywell argues Vega cannot establish that her working environment was "permeated with 'discriminatory intimidation, ridicule, and insult' … that is 'sufficiently severe or pervasive to alter the conditions" of her employment.  (P&A at 9:18–10:5.)  In support of this argument, Honeywell contends Vega has provided no evidence of the type of conduct required for a hostile environment claim—i.e., "racial slurs, sexist remarks, racially or sexually derogatory acts, physical threats, touching or violence."  (Id. 9:2–17.)

Vega's response to Honeywell's argument is in Section E of the Opposition. (Opp'n at 23:1–19, 24:14–25:17.)  There, she contends the "hostility of Ms. Vega's work environment satisfies the" standard.  (Id. 24:14–15.)  But nowhere in that section does Vega identify the conduct she contends created a hostile environment.  (See id. 23:1–25:17.)  Instead, Vega focuses on the emotional impact the alleged "hostility" had on her. (Id. 24:14–25:17.)  Evidence of the emotional toll is relevant in demonstrating her subjective belief that the working environment was hostile.  See Harris v. Forklift Sys.,

19

Inc., 510 U.S. 17, 23 (1993) ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."). However, it is not sufficient to support a finding that her environment was objectively hostile.

The Court also agrees with Honeywell's contention that the type of conduct identified in other parts of her opposition—refusal to offer a raise with the 2014 job offer, disputes regarding whether Vega should have to make up sick time, demands that Vega work weekends, and the timecard fraud investigation—do not support a hostile environment claim.

In Lelaind, 576 F.Supp.2d 1079, the district granted summary judgment against a hostile environment claim that was based on conduct similar to the type alleged by Vega—the failure to promote, negative criticism and performance evaluations, and a transfer to another job site. Id. at 1102. The court explained,

> although sufficient to form a basis for plaintiff's disparate treatment and retaliation claims, [the conduct] is insufficient as a matter of law to form a basis for plaintiff's hostile work environment claim. This is because the conduct, as perceived by a reasonable person, is not objectively severe, hostile or abusive. None of the actionable conduct involves the type of actions typical of hostile environment claims, for example, racial slurs, sexist remarks, racially or sexually derogatory acts, physical threats, touching, or violence.

Id. (citing Harris, 510 U.S. at 19–20). Consistent Leiland's reasoning, the Ninth Circuit has explained that "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim *when that conduct is viewed in the context of other, overtly gender-discriminatory conduct*." O'Shea v. Yellow Technology Services, Inc., 185 F.3d 1093 (9th Cir. 1999) (emphasis added) (citing Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir.1994)).

In O'Shea, plaintiff was a systems administrator responsible for managing workloads and assisting in employee evaluations for a team of systems programmers. A month after she began working, Gary Jones, another systems administrator joined the

team.  Plaintiff and Jones soon began to experience conflicts in their working relationship, and plaintiff alleged numerous instances of harassment.  The incidents involved, among other things, him making fun of his wife and making derogatory comments about women; stating that plaintiff was incompetent and unable to do her job, that she was overemotional and hysterical and that women in general were incompetent, stupid, and scatterbrained; telling coworkers within an earshot of plaintiff about a dream of a woman jumping naked on a trampoline, and describing how the woman's breasts looked; stating that "Playboy is superior to a wife because at least with Playboy you get variety"; and repeatedly telling coworkers that plaintiff was going to file a sexual harassment complaint against him.  Id., 185 F.3d at 1098-99.  Two other male employees also "made derogatory comments about women … all the time."  Id. at 1099.

In addition to the "obviously sex-and-gender-related conduct", plaintiff alleged certain "gender neutral" conduct contributed to the hostile atmosphere.  O'Shea, 185 F.3d at 1099.  For example, male programmers never invited plaintiff to lunch; when she would approach a group of male programmers discussing technical matters, they would shift the subject to matters such as golf, tennis or running; and male coworkers became less communicative with plaintiff after Jones joined the team, and they completely ignored her when she tried to discuss projects.  Because of her difficulties, plaintiff repeatedly complained to human resources, but her complaints were generally met with indifference.   Eventually, plaintiff quit and sued the company for a hostile work environment.

In holding that plaintiff "presented genuine issues of fact as to whether 'she was the object of harassment because of her gender[,]" the Ninth Circuit found that "[a]t the very least, the non-sexually explicit or non-gender motivated conduct which occurred after Mr. Jones began working on the UNIX team is relevant to the evaluation of Plaintiff's hostile work environment claim."  Id. at 1102.  The reason was that "the obviously sex and gender-motivated conduct" by Jones and the two other male workers "so poisoned the entire body of conduct toward Plaintiff that a jury reasonably could

view *all* of the allegedly harassing conduct occurring after Jones began working for Defendant as the product of sex and gender hostility." Id. (emphasis in original).  Then, relying on Jones' "frequent derogatory comments about women, [telling] people that Plaintiff was incompetent, [refusing] to cooperate and share work information with Plaintiff, and [making] at least two overtly sexual comments so that Plaintiff could hear them," the court found a "jury reasonably could conclude that, as a result of Mr. Jones' and others' conduct, Plaintiff was subjected to an environment "permeated with discriminatory intimidation, ridicule, and insult." Id. (citation omitted).  "We therefore hold that Plaintiff established a genuine issue of material fact regarding whether the alleged conduct was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" Id.

This Court interprets O'Shea as confirming that non-sexually explicit conduct alone is insufficient to satisfy the "severe or pervasive" requirement.  Instead, such conduct must be accompanied by other acts that are more clearly sex and gender-motivated, such as racial slurs, sexist remarks, racially or sexually derogatory acts, physical touching, etc.

Here, Vega has failed to provide evidence of any comments or conduct in the incidents identified in her opposition—the 2014 job offer, the disputes regarding whether Vega should have to make up sick time, the demand that Vega work the weekend of June 2, and the timecard fraud investigation—that are sufficient to support a hostile environment claim, such as "racial slurs, sexist remarks, racially or sexually derogatory acts, physical threats, touching, or violence." Leiland, 576 F.Supp.2d 1102.

The Court recognizes the type of statements DiCiero made during his interview about the Span trip are closer to the type supporting a hostile environment claim.  However, his comments are insufficient to create a disputed issue of fact for at least two reasons.  First, the evidence establishes the comments were made during an interview as part of an internal investigation into Vega's June 2017 complaint.  (*See Pl's Ex. 8*.)  Vega has provided no evidence indicating whether she became aware of his statements while

still employed at Honeywell or whether she learned about them during discovery in this case.  Because there is no basis to infer that Vega was aware of the comments while at Honeywell, they cannot support her hostile environment claim.  See Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 959 (9th Cir. 2012) ("evidence of harassment of other racial minorities may be considered in evaluating a claim, as long as [the plaintiff] presents evidence that [she] knew about the offending behavior. [Citation omitted.]") (brackets in original).

Second, and more importantly, even if Vega was aware of DiCiero's comments while at Honeywell, a single incident of sexist remarks is insufficient for a jury to reasonably find a "severe or pervasive" hostile environment.  See Fisher v. San Pedro Peninsula Hospital, 214 Cal.App.3d 590, 611–612 (1989) (listing cases that have "concluded that isolated instances of sexual harassment do not constitute a hostile work environment.").   Because there is no evidence Vega was subject to other similar comments or conduct while at Honeywell, this Court finds DiCiero's comments insufficient as a matter of law.

For all these reasons, the Court finds summary adjudication is warranted as to Vega's hostile environment claim under FEHA and Title VII.

### 3.    Disparate impact.

To prevail on a disparate impact claim, plaintiff must show "a facially neutral employer practice or policy, bearing no manifest relationship to job requirements, in fact had a disproportionate adverse effect on members of the protected class." Turman v. TurningPoint of Cent. California, Inc., 191 Cal. App. 4th 53, 61 (2010) (citations omitted).   This requires the plaintiff to establish the following three elements: (1) the challenged employment practice; (2) a disparate impact; and (3) causation.  Doubt v. NCR Corp., 2014 WL 3897590, at *7 (N.D. Cal. Aug. 7, 2014).  Because of the similarity between state and federal employment discrimination laws, California courts

look to pertinent federal precedent when applying California statutes.  Guz v. Bechtel National, Inc., 24 Ca1.4th 317, 354 (2000) (citation omitted).

Honeywell seeks summary adjudication of Vega's disparate-impact claim on the basis that Vega has failed to provide evidence showing that a neutral policy has had a disproportionate adverse effect on women at Honeywell.  (*P&A* at 10:18–11:3.)

Vega's opposition does not appear to address Honeywell's arguments.  Vega, therefore, has not provided evidence that any neutral policy has had a disproportionate adverse impact on women.  Because Vega has provided no such evidence, the Court finds she failed to establish her disparate impact prima facie case.

### 4.    Maternity discrimination.

FEHA prohibits discrimination based on "sex, gender, gender identity, gender expression, age, or sexual orientation."  Cal. Gov. Code §§ 12940(a).  Because neither caregivers nor parents are listed under FEHA, Honeywell argues Vega cannot maintain her maternity discrimination claim.  (*P&A* at 11:5–12.)

Vega's opposition does not address Honeywell's argument regarding the maternity discrimination claim and thus provides no authority for the proposition that caregivers or parents are a protected class under FEHA.  Accordingly, Honeywell is entitled to summary adjudication of this claim.

As for Vega's Title VII claim, in the Ninth Circuit, maternity or sex-plus discrimination is actionable, but the plaintiff must establish the employer "applied a requirement to one sex but not the other, and then discriminated based on that requirement."  Kelley v. Amazon.com, Inc., 2013 WL 6119229 at * 14 (E.D. Wash. Nov. 21, 2013).  Honeywell argues Vega cannot prevail on her Title VII maternity or sex-plus discrimination claim because she provides no evidence showing "only women with children were asked to work weekends without advance notice."  (*P&A* at 20:25–27.) Vega failed to address this argument and failed to provide evidence that only women with

children were asked to work weekends without advance notice.  Honeywell is also

entitled to summary adjudication of this claim under Title VII.

### C.    Equal Pay Act – Federal and State.

Vega is asserting claims under the California and Federal Equal Pay Acts.

Although the statutory language of the two statutes differ, the substantive elements of an

equal pay claim under the statutes are identical.  Nagley v. Judicial Council of California,

2010 WL 11545605, at * 5 (N.D. Cal. June 21, 2010).  California courts, therefore, rely

on federal case law to interpret the state statute. See Green v. Par Pools Inc., 111 Cal.

App. 4th 620, 623 (2003) ("The California statute is nearly identical to the federal Equal

Pay Act of 1963. Accordingly, in the absence of California authority, it is appropriate to

rely on federal authorities construing the federal statute.")

The Federal Equal Pay Act "is broadly remedial and courts should construe and

apply it so as to fulfill the underlying purposes that Congress sought to achieve."

Forsberg v. Pacific Northwest Bell Telephone Co., 840 F.2d 1409, 1414 (9th Cir. 1988)

(citing Corning Glass Works v. Brennan, 417 U.S. 188, 208 (1974). The EPA embodies

the principle that employees doing equal work should be paid equal wages, regardless of

sex. Id.

Under both statutes, "in order to establish a prima facie case of pay discrimination,

a plaintiff must produce sufficient evidence to demonstrate that employees of the

opposite sex were paid different wages for equal work."  Nagley, 2010 WL 11545605, at

* 6 (citing Stanley v. Univ. of S. Cal., 178 F.3d 1069, 1073-74 (9th Cir. 1999)).  This

requires the plaintiff to present a "comparison of the jobs in question, ... not ... a

comparison of the individuals who hold the jobs."  Stanley, 178 F.3d at 1074.  "Plaintiff

need only show that 'the jobs being compared are substantially equal, not necessarily that

they are identical.'"  Forsberg, 840 F.2d at 1414 (quoting Spaulding v. University of

Washington, 740 F.2d 686, 697 (1984)).

Jobs are "substantially equal" if they satisfy a two-part test.  Stanley, 178 F.3d at 1074.  First, the plaintiff must establish the two positions have a "'common core of tasks, i.e. whether a significant portion of the two jobs is identical.'"  Id. (quoting Brobst v. Columbus Servs. Int'l, 761 F.2d 148, 156 (3d Cir. 1985)) (some internal quotation marks omitted).  If a plaintiff establishes a "common core of tasks, the court must then determine whether any additional tasks, incumbent on one job but not the other, make the two jobs 'substantially different.'"  Id. at 1074 (quoting Brobst, 761 F.2d at 156) (some internal quotation marks omitted).

Here, Vega seeks to establish her prima facie case by comparing her salary to three men listed on Honeywell's Pay Data Chart.  (*Opp'n* at 22:15–24, citing *Pl's Ex. 34* [Doc. 89-35[22]].)  There are several problems with Vega's argument and reliance on the chart.

First, Vega's argument is based on the contention that she should be considered a Technical Manager because she "regularly filled in for Ms. Hunt when Ms. Hunt was away." (*Opp'n* at 22:5–14.)  But there is no dispute that Vega was a Principal Applications Engineer in 2015 and a Principal Systems Engineer in 2017, not a Technical Manager.  In fact, she turned down the position in December 2014.  Additionally, Vega's previous Technical Manager, Dennis Martin, made considerably less than Vega did as a Principal Applications Engineer.  (*Pl's Ex. 4* at 79:6–23; *Def's Ex. 3 / E* at 191:10–192:12.)

In addition, the Pay Data Chart also reveals that another male Technical Manager—Male F—made only slightly more than Vega in 2017.  (*Pl's Ex. 34*.)  And although Male F made slightly more that Vega annually, he was a fulltime Technical Manger as opposed to Vega who, at best, filled in as a Technical Manager when Hunt was away.  Under Vega's theory that Technical Managers should have made more than

---

[22] The unsealed Exhibit 34 is at Doc. 69-30.

26

Principal Applications Engineers[23], the modest salary difference between Male F and Vega does not support her EPA claim.

Second, Vega's argument is unconvincing because two of the three men she compares herself to have different titles / positions from each other and from Vega. Male Y is a Technical Software Manager in Phoenix and Male A is a Technical Manager in Morristown, New Jersey. (*Pl's Ex. 34*.) In addition to these employees' different titles and locations, Vega provides no information regarding whether they performed the same common core of tasks and under similar conditions to Vega. See Green, 111 Cal.App.4th at 628. Instead, Vega's opposition speculates that they "likely performed the same work as Julia Vega . . . ." (*Opp'n* at 22:18–20.) In opposing summary judgment, Vega must do more than speculate that they performed the same work. For this reason, Vega has provided no evidence supporting her assertion that Male Y and Male A are comparable employees.

Finally, a review of the Pay Data Chart appears to contradict Vega's EPA claims. While Male O made slightly more than Vega as a Principal Systems Engineer in 2017, there are numerous other male Principal Systems Engineers that made significantly less than both Male O and Vega. They include Male E, Male N, Male R and Male W. (*Pl's Ex. 34*.) Additionally, aside from Male O, one other male Principal Applications Engineer made more annually than Vega in 2017, while a third—Male Z —made approximately $100 more than Vega annually. (*Id.*) In other words, when compared with all the male Principal Systems Engineers on the Pay Data Chart, Vega was near the top in terms of salary.

---

[23] Vega's contention that Technical Managers made more than Principal Applications Engineers is also contradicted by Hunt. During her deposition, Hunt testified that "historically," moving from a principal engineer to a technical manager was considered a lateral move so "sometimes, people got nothing" in terms of a pay raise. (*Pl's Ex. 7* at 41:2–5.)

1   For these reasons, the Court finds the Pay Data Chart—standing alone and without

2   any other information regarding the comparable men—does not support Vega's EPA

3   claims.  Because Vega has failed to establish her prima-facie case of an EPA violation

4   under federal and state law, Honeywell is entitled to summary adjudication of these

5   claims.

6

7       **D.    Retaliation**

8       To state a prima-facie case for retaliation, plaintiff must show (1) she engaged in

9   protected activity, (2) she was subjected to an adverse employment action, and (3) a

10  causal link between the protected activity and adverse action.  Yanowitz v. L'Oreal USA,

11  Inc., 36 Cal.4th 1028, 1050–51 (2005) (FEHA); Burlington Northern & Santa Fe Ry. Co.

12  v. White, 548 U.S. 53, 59 2006) (Title VII).  "[C]laims for retaliation under Title VII

13  [and] FEHA… are analyzed under the *McDonnell Douglas* burden-shifting framework."

14  Lelaind, 576 F.Supp.2d at 1094 (citations omitted).  On summary judgment, "once an

15  employee establishes a prima facie case, the employer is required to offer a legitimate,

16  nonretaliatory reason for the adverse employment action."  Yanowithz, 36 Cal.4th at

17  1042 (citing Morgan v. Regents of University of California, 88 Cal.App.4th 52, 68

18  (2000)).  "If the employer produces a legitimate reason for the adverse employment

19  action, the presumption of retaliation 'drops out of the picture,' and the burden shifts

20  back to the employee to prove intentional retaliation."  Id. (citing Morgan, 88

21  Cal.App.4th at 687).

22      "Adverse action" under FEHA must materially affect the terms and conditions of

23  employment.  Yanowitz, 36 Cal.4th at 1050–51.  It must be "more disruptive than a mere

24  inconvenience or an alteration of job responsibilities."  Thomas v. Dep't of Corr., 77

25  Cal.App.4th 507, 511 (2000).  Examples of an adverse employment action are "a

26  termination of employment, a demotion evidenced by a decrease in wage or salary, a less

27  distinguished title, a material loss of benefits [or] significantly diminished material

28  responsibilities."  Id.  A causal link requires plaintiff to show that one of the decision

makers responsible for the adverse employment action knew plaintiff engaged in protected activity.  Ferretti v. Pfizer Inc., 2013 WL 140088, at *10 (N.D.Cal. 2013).

There is no dispute that Vega engaged in protected activity when she complained to Barbara Brockett on June 23, 2017, about discrimination related to the Spain trip, and subsequently about Asplund.  Honeywell argues, however, that Vega failed to provide evidence of (1) an adverse employment action and (2) a causal link between the alleged adverse action and her protected activity.  (*P&A* at 13:19–16:7.)  In her opposition, Vega alleges two adverse employment actions occurred after she complained to Brockett: the timecard fraud investigation and being reassigned to NG HUMS after she was cleared in the timecard fraud investigation.[24]  (*Opp'n* at 17:1–15, 21:3–12.)  The Court will evaluate each employment action separately.

### 1.    The timecard fraud investigation.

Vega contends the timecard fraud investigation constitutes an adverse employment action and that the proximity between her complaint and the accusation—i.e., five days—establishes the necessary link between the two events.  (*Opp'n* at 19:17–20.)  Assuming the investigation constitutes an adverse employment action, its proximity to her protected activity satisfies the causal link for purposes of establishing a prima facie case.  See Poland v. Chertoff, 494 F.3d 1174, 1180, n.2 (9th Cir. 2007) ("At the prima facie stage of retaliation case, '[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.' [Citation omitted]").

---

[24] Vega also discusses the Friday, June 2, 2017 meeting during which Asplund and Nielson demanded Vega work over the weekend, and the subsequent emails between Asplund and Nielson expressing disappointment at Vega's refusal to work over the weekend.  (*Opp'n* at 17:21–18:12.)  The point of the discussion is not entirely clear.  For example, nowhere does she state that her refusal to work over the weekend constitutes protected activity.  Nor does she cite any case law that would support such a position.

In response to Vega's prima facie case, Honeywell challenges the causal link by pointing out the timecard fraud investigation was initiated by a female coworker who was concerned about Vega's timecard entries for the NG HUMS project.  (*P&A* at 15:6–8.) Additionally, Honeywell contends the evidence does not support a causal link because none of the individuals who initiated the timecard fraud investigation were aware of Vega's complaint to Brockett.  (*Id.* 15:9–27.)  The Court is persuaded by Honeywell's argument.

The evidence confirms that Nielson, Vega's female coworker, raised concerns about Vega's timecard.  (*Def's Ex. 1 / A* at 194:10–20; *Def's Ex. 6 / H* [Doc. 91-6[25]] HWI000484–485.) The Director of Engineering, Ed Prado, then directed Asplund to initiate the investigation.  (*Def's Ex. 5 / G* at 183:11–184:4; *Def's Ex 6 / H* at HWI000484.)  Vega has produced no evidence suggesting Asplund somehow influenced or played any part in Nielson's decision to raise concerns about Vega's timecard or Prado's decision to order the investigation.

Significantly, Vega does not provide evidence suggesting Nielson, Prado or even Asplund were aware of Vega's complaint to Brockett when Nielson made the timecard fraud accusation.  The only person Brockett agreed to notify about Vega's complaint was Kevin Calcagni, who was not involved in the timecard fraud investigation; he was involved in investigating Vega's complaint.  (*Def's Ex. 8 / K* [Doc. 91-8] 80:1–81:6; *Def's Ex. 9 / L* [Doc. 91-9[26]] JV00014045; *Def's Ex. 10 / M* [Doc. 91-10] HWI000299.) Calcagni then disclosed Vega's complaint to Human Resource Manager Pamela Davis on July 7, 2017—well after Vega was accused of timecard fraud—and the investigation into her claims was opened.  (*See Def's Ex. 10 / M*.)

Vega nevertheless offers two theories as to how Asplund could have found out about her complaint about the Spain trip.  First, Vega points out that she confronted Lilly

---

[25] The unredacted Exhibit 6/H is at Doc. 92-5.
[26] The unredacted Exhibit 9/L is at Doc. 92-7.

on June 20, 2017, about the Spain trip, and that he subsequently "reported that Ms. Vega 'was visibly upset and wouldn't let it go' and told him that she had already talked to Mr. DiCiero about the issue." (*Opp'n* at 19:25–28.)  Vega then speculates that although "Ms. Vega had not yet officially reported discrimination to Ms. Brockett, either Mr. Lilly or Mr. DiCiero could have easily inferred she was about to report and communicate their concerns to Mark Asplund." (*Id.* 20:1–3.)

Aside from the complete lack of evidence that Lilly or DiCiero warned Asplund that Vega *might* report the Spain incident, Vega's theory also fails to account for the fact that Nielson—not Asplund—made the timecard fraud allegation, and Prado—not Asplund—ordered the investigation.  Thus, in addition to speculating that DiCiero and Lilly "could have" reported the issue to Asplund, Vega's theory depends on more speculation: that Asplund then convinced Nielson to accuse Vega of timecard fraud.  Again, there is no evidence supporting such an inference.

Vega next asserts that Asplund or Nielson could have learned about her complaint through Hunt, who Vega had informed about the complaint.  Relying on the unsupported assertion that Hunt had a "pattern of revealing others' private information to Ms. Vega," Vega contends Hunt "[a]s the coordinator on NG HUMS and Mark Asplund's direct report, … had ample opportunity to inform either Ms. Nielson or Mr. Asplund of Ms. Vega's protected activity." (*Opp'n* at 20:7–16.)

Again, despite the close of discovery, which included taking Hunt's deposition, Vega cites no evidence supporting this theory.  In fact, Vega does not even cite evidence supporting the assertion that Hunt revealed "others' private information to Ms. Vega."

In summary, Vega's attempt to establish a causal link is unavailing because it is based entirely on speculation and conjecture.  <u>See</u> <u>Tommy Bahama Grp., Inc. v. Sexton</u>, 2009 WL 4673863 at n *3, n. 2 (N.D.Cal. Dec. 3, 2009) ("conclusory statements, legal conclusion or conjecture, put forth without an evidentiary basis" are insufficient to defeat summary judgment).  Given Vega's failure to provide evidence that Asplund was involved in initiating the timecard fraud investigation or that he knew about Vega's

complaint to Brockett, the Court finds Vega cannot establish causation between her complaint and the timecard fraud investigation. See Ferretti, 2013 WL 140088, at *10 (causation requires "that at least one of the persons responsible for making each adverse employment decision had knowledge that Plaintiff had engaged in protected activity. [Citation omitted.]").

### 2.    Vega's reassignment to NG HUMS.

Vega contends that her reassignment to NG HUMS after she was cleared in the timecard fraud investigation constitutes an adverse employment action. (*Opp'n* at 21:3–12.)  But Vega fails to explain how being reassigned to the project materially affected the terms and conditions of employment.  For example, Vega does not claim the reassignment was tantamount to a demotion or a less distinguished title, nor does she explain how the reassignment resulted in a material loss of benefits or diminished material responsibilities. See Thomas, 77 Cal.App.4th at 511 ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").  Instead, Vega supports this theory by citing Yanowitz, 36 Cal.4th 1028, for the proposition that "adverse employment actions may be 'a series of subtle, yet damaging injuries,'…." (*Id.* at 21:7–10.)  Vega's reliance on the case is misplaced.

In Yanowitz, plaintiff alleged retaliation for refusing to follow her supervisor's discriminatory order to terminate another female employee, who the supervisor believed was not attractive enough to sell cosmetics. Id. at 1038.  To satisfy the adverse employment action element, plaintiff argued she should be allowed to rely on a pattern of systematic retaliation by her employer, consisting of: (1) unwarranted negative performance evaluations; (2) refusing to allow plaintiff to respond to unwarranted criticism; (3) unwarranted criticism in the presence of other employees, and a

"humiliating" public reprobation; (4) fueling employee resentment for which plaintiff was chastised; and (5) her supervisor's solicitation of negative feedback from plaintiff's staff.  Id. at 1055.  The California Supreme Court agreed with plaintiff, reasoning "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle yet damaging, injuries."  Id. at 1139.  The court also explained that "a series of separate retaliatory acts collectively may constitute an 'adverse employment action' even if some or all of the component acts might not be individually actionable."  Id. at 1058.

Yanowitz does not assist Vega because her theory is based on one employment action—being reassigned to the NG HUMS project.  And unlike the negative performance evaluations and criticisms that formed the basis for the Yanowitz plaintiff's claim, Vega does not identify anything inherently negative related to her reassignment.  For example, there is no indication that being reassigned to NG HUMS was a demotion or resulted in the loss of compensation.  Because Vega has failed to explain how her reassignment materially affected the terms and conditions of her employment, the Court finds it does not constitute an adverse employment action.[27]

* * *

In summary, Vega has failed to establish a causal link between her June 23, 2017 complaint and Nielson's accusation that Vega may have committed timecard fraud.  Additionally, Vega has failed to establish that her reassignment to the NG HUMS project

---

[27] Additionally, in contrast to Yanowitz, Vega has not identified a series of other alleged retaliatory acts that occurred after she complained of gender discrimination to Brockett.  All of the other incidents of alleged discrimination discussed in Vega's opposition—the 2014 Technical Manger job offer, disputes in early 2017 regarding whether Vega had to make up sick time, and demands in early June 2017 that Vega work weekends—occurred before she complained to Brockett.

constitutes an adverse action.  Accordingly, summary adjudication is warranted with respect to Vega's FEHA and Title VII retaliation claims.[28]

### E.    Intentional Infliction of Emotional Distress.

"The elements of a cause of action for intentional infliction of emotional distress are (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress." Fisher, 214 Cal.App.3d at 617 (quoting Molko v. Holy Spirit Assn., 46 Cal.3d 1092, 1120 (1986)).  "Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society, and is of a nature which is especially calculated to cause, and does cause, mental distress." Id.  "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Id.  While conduct that amounts to a hostile work environment will support an intentional infliction of emotional distress cause of action (Fisher, 214 Cal.App.3d at 618), personnel decisions, even if based on an improper discriminatory motive will not (Janken v. GM Hughes Electronics, 46 Cal.App.4th 55, 80 (1996)).

Honeywell contends Vega cannot establish the first element because her cause of action is based on "every-day management decisions that do not reach the level of outrageous conduct."  (*P&A* at 17:24–18:3.)  Section E of Vega's opposition addresses Honeywell's argument regarding the intentional infliction of emotional distress cause of

---

[28] In her opposition, Vega also discusses the June 2, 2017 meeting, wherein Asplund and Neilson demanded Vega work over the weekend, and Nielson and Asplund's subsequent e-mail exchange in which they expressed disappointment with Vega.  (*See Opp'n* 17:21–18:12.)  The Court agrees with Honeywell that the point of the discussion is unclear given that she does not connect the incident to the two alleged adverse actions (the timecard fraud investigation and being reassigned to NG HUMS). Moreover, because the incident preceded her complaint to Brockett by approximately 3 weeks, there is no causal link between her protected activity and the meeting.

action.  In that section, Vega contends "[t]he hostility of Ms. Vega's work environment satisfies the standards for" this cause of action.  (*Opp'n* 24:14–15.)  Her opposition then fails to identify the conduct that makes-up the "hostility" in her work environment, instead focusing on the emotional effects the "hostility" had on her.  Because Vega provides no evidence of the hostile work environment, the Court finds Honeywell is entitled to summary adjudication of this cause of action.[29]

## F.   Constructive discharge.

Vega's ninth cause of action is for constructive discharge.  In <u>Turner v. Anheuser-Busch, Inc.</u>, 7 Cal.4th 1238 (1994), the California Supreme Court evaluated "what kinds of action or conditions are sufficient to convert what is ostensibly a voluntary quit into a discharge."  <u>Id.</u> at 1245.  The court explained the "conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer."  <u>Id.</u> at 1246.  Generally, this requires the adverse working conditions "must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable."  <u>Id.</u> at 1247.  "The essence of the test is whether, under all the circumstances, the working conditions are so unusually

---

[29] Honeywell also argues that because her cause of action is based on personnel actions, which "are a normal risk of her employment," the claim is barred by the exclusive remedy provision of California Worker's Compensation Act.  (*P&A* at 17:10–19.)  However, Honeywell's argument appears contrary to <u>Miller v. Fairchild Industries, Inc.</u>, 885 F.2d 498, 510 (9th Cir. 1989), which held plaintiffs' termination after settling a complaint for racial discrimination was not "a 'normal' pattern of events in the workplace" and thus supported a claim for intentional infliction of emotional distress.  <u>See</u> <u>also</u> <u>Ledezma v. Walmart, Inc.</u>, 2018 WL 6830492, n 1 (C.D.Cal. 2018) (claim based on disability discrimination "likely not within the normal course of employment"); <u>Steel v. Federal Exp. Corp.</u>, 2015 WL 1475942, *3 (C.D.Cal. 2015) (denying plaintiff promotions eight times with evidence of improper motive is not conduct that is "normal part of the employment relationship").  Regardless, the Court need not decide the issue given its finding that Vega has not provided evidence of "outrageous conduct beyond the bounds of human decency…."  <u>Janken</u>, 46 Cal.App.4th at 80.

adverse that a reasonable employee in plaintiff's position . . . would have felt compelled to resign." Id. at 1247 (citations omitted).

Honeywell argues summary adjudication of this claim is warranted because Vega cannot show her work environment was so intolerable when she resigned.  (*P&A* at 23:24–26.)  The Court disagrees.

In her opposition, Vega argues that a continuous pattern of discriminatory conduct will support a constructive discharge cause of action.  (*Opp'n* at 23:20–27.)  In support of this argument, Vega cites Nolan v. Cleland, 686 F.2d 806 (9th Cir. 1982), which reversed the district court's grant of summary judgment finding that a history of discrimination raises triable issues of fact regarding whether the plaintiff's working conditions were sufficiently intolerable.  Id. at 813–814.  Similarly, in Valdez v. City of Los Angeles, 231 Cal.App.3d 1043 (1991), the California Court of Appeal reversed the trial court's order granting summary judgment against plaintiff's constructive discharge claim finding that evidence plaintiff was repeatedly denied training opportunities and work assignments was sufficient to create a triable issue of fact.  Id. at 1055–1060.

As discussed above, there is sufficient evidence to create a triable issue of fact regarding Vega's disparate treatment claim based on the theory she was denied aircraft survey opportunities.  Under Nolan and Valdez, the evidence is sufficient to create a disputed issue of fact regarding Vega's constructive discharge claim.[30]

## IV.   CONCLUSION & ORDER

 For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' summary-judgment motion [Doc. 42] as follows: Defendant's motion is **DENIED** as to Plaintiff's Title VII and FEHA disparate treatment claim based on the

---

[30] Honeywell also argues summary adjudication is warranted because Vega cannot establish damages because she immediately began working at ViaSat.  (*P&A* at 23:24–26.)  The problem with this argument is that Honeywell, as the moving party, cites absolutely no authority indicating that damages are a necessary element for a constructive discharge cause of action.

Spain trip, and pay discrimination, and Plaintiff's constructive discharge cause of action.

Defendant's motion is **GRANTED** as to the remaining claims.

**IT IS SO ORDERED**

Dated:  March 30, 2021

_____

Hon. Thomas J. Whelan
United States District Judge

37